# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| RONALD DALE BURSTON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:12-CV-00030 SNLJ |
| | ) | |
| MICHAEL HAKALA, M.D., LISA BARNES, CHARLANA DUNN, RUTH TAYLOR, ANGELA RIDDELL, | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | Case No. 1:12-CV-00031 SNLJ |
| RUSSELL GRAHAM, M.D., STEPHANIE NOVAK, | ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| PAMELA LACY AND STEPHANIE NOVAK, | ) ) | Case No. 1:12-CV-00032 LMB |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Ronald Dale Burston, Jr. filed three 42 U.S.C. § 1983 claims on February 15, 2012 against defendants Michael Hakala, M.D., Lisa Barnes, Charlana Dunn, Ruth Taylor, Angela Riddell, Russell Graham, M.D.,[1] Stephanie Novak, and Pamela Lacy. The defendants were employed at the Southeast Correctional Center ("SECC") in Charleston, Missouri, where plaintiff was previously incarcerated. Defendants Hakala, Taylor, Novak, and Lacy moved for summary judgment (#64).

Defendants' motion to consolidate the plaintiff's claims into a single case was granted. Currently before the Court is defendants Hakala, Taylor, Novak, and Lacy's motion for summary

---

[1] Defendant Graham has not yet received service of process and is therefore not involved in this action at this time; the other defendants have been dismissed.

judgment (#64). Plaintiff responded and later moved for the inclusion of additional evidence (#74). These matters are now fully briefed and is ripe for disposition.

**I. Case Summary**

Plaintiff has been diagnosed with a number of medical problems including HIV, diabetes, obesity, eczema, gout, headaches, hypertension, respiratory issues, difficulty sleeping, bipolar disorder, schizoaffective disorder, and attention deficit hyperactivity disorder. He claims that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by deliberately denying him proper medical care under 42 U.S.C. § 1983 during his incarceration at SECC from November 2009 to March 2012. In his initial complaints, plaintiff alleged that defendants did not treat his HIV and complications arising from his HIV, resulting in a worsening of his condition causing symptoms including but not limited to: pain, swelling, weight loss, and skin afflictions (*e.g.*, rashes and open sores).

He also alleged he was wrongfully ordered a liquid diet and that the liquids were not drinkable, a feeding tube was inserted that caused him discomfort and prevented him from breathing, and that Dr. Graham refused to send him to the hospital for his multiple complaints. He further alleged that defendant Novak, an administrative nurse at SECC, acted unprofessionally and delivered inappropriate care, and defendant Lacy, a nurse employed by SECC, deliberately gave him the wrong medication. He states that the defendants caused significant deterioration of his mental and physical condition, emotional distress, and forced him to self-medicate with marijuana which resulted in additional criminal charges. In his opposition to the defendants' motion for summary judgment, plaintiff expounds upon his previous complaints, alleging that the defendants' refusal to send him to a specialist is responsible for the

continuing pain and swelling in his throat, feet, and legs, and that defendant Novak did "everything in her power" to prevent him from receiving medical care for his throat. The plaintiff did not include any citations in his opposition to establish these allegations as material facts, nor does he specifically admit or deny any of the material facts set forth by the defendants. Therefore, the facts submitted by the defendants are uncontroverted. The plaintiff admits he was given medications to address his medical problems and evaluated by multiple healthcare providers --- doctors, nurses, and nurse practitioners --- throughout his incarceration. He requested injunctive relief and money damages.

### A. Treatment of Plaintiff's HIV

The plaintiff was diagnosed with HIV in 2007. He was transferred to SECC in November 2009 and upon transfer was referred to the infectious disease nurse, who noted plaintiff was compliant with his HIV medications at that time. Plaintiff was also enrolled in the infectious disease clinic. He alleges he was denied his HIV medications, resulting in pain, weight loss, and the worsening of his chronic skin condition. The record reflects he was seen at the infectious disease chronic clinic nineteen times during the approximately two and a half years he was incarcerated at SECC, and that he voluntarily missed two additional appointments (#65). Dr. Hakala was his physician at three of those appointments. Uncontested blood test results show that his CD4 levels[2] and viral load were within normal limits from August 2009 to February 2013, which demonstrates that his HIV was effectively controlled while at SECC (#65). Plaintiff's medical records further detail that his HIV medications were ordered throughout his

---

[2]CD4 cells are a type of white blood cell. The number of these cells shows the disease's stage and how it may progress, the strength of the body's immune system, and the effectiveness of HIV treatment.

incarceration and given regularly. However, on multiple occasions from 2009 to 2012, the plaintiff refused to take his medications.³ When that occurred, plaintiff was counseled as to their importance and encouraged to comply with his physician-ordered treatment plan. Sometimes, plaintiff was also referred to a physician or mental health provider for additional assessment and counseling regarding medication compliance. During his time at SECC, he was also seen and treated at the pulmonary/asthma clinic and the endocrine/diabetes clinic for his extensive medical issues.

### B. Plaintiff's Lower Limb Complaints

Plaintiff alleges he did not receive *any* medical treatment for pain and swelling in his lower extremities while at SECC. However, the medical records show he was assessed and treated by Dr. Hakala and the healthcare staff for those complaints throughout his incarceration at SECC. He received multiple medications for lower extremity pain, neuropathy, and swelling including: allopurinol, naproxen, Motrin, colchicine, Toradol, Benedryl, and Elavil in addition to lab testing. He was also reassessed numerous times for his continuing lower limb complaints and his treatments were adjusted following reassessment as prescribed. Additionally, the plaintiff's medical records show that plaintiff's requests for treatment or treatment plan changes were usually granted, when deemed appropriate by his physicians in accordance with their medical training and judgment. For example, during one appointment, Dr. Hakala examined and removed the plaintiff's ingrown toenail upon request. During another, Dr. Hakala prescribed Elavil for plaintiff's complaints of lower extremity pain and neuropathy.

### C. Plaintiff's Throat Swelling & Liquid Diet

---

³Other instances of noncompliance in the medical records include plaintiff refusing to allow healthcare staff to check his vital signs or perform physical assessments of his mouth and throat, and refusing to go to regularly scheduled appointments.

Plaintiff alleges he was denied adequate nutrition for a period of nine days to three weeks because he was placed on a liquid diet and the liquids were not drinkable. The liquid diet was ordered after the plaintiff self-declared a medical emergency for difficulty breathing and a swollen tongue on July 29, 2010 and complained of continued tongue swelling, difficulty breathing, and an inability to swallow July 31, 2010 through approximately August 4. During that time, the medical records reflect plaintiff's vital signs were stable, his oxygen saturation was normal,[4] and healthcare staff listed his condition as "urgent," but not an emergency (*i.e.*, it did not require hospitalization). Dr. Graham examined the plaintiff on July 29, prescribed Benedryl to treat his complaints, and had him admitted to the Transitional Care Unit ("TCU"), where he could be observed by medical staff. Plaintiff alleged that Dr. Graham planned to send him to the hospital, but Nurse Novak changed his mind. Defendants state that no nurse has the authority to change a physician's prescribed course of treatment. Dr. Hakala examined the plaintiff on July 31, 2010 and noted he had "soft palate and uvula" swelling and "abundant post nasal drip." He further reported that --- although the plaintiff complained he could not swallow anything, including liquids --- his lungs were clear, he was not drooling, he had full range of motion of his tongue, he had eaten sausage for breakfast that morning, and he was not having any difficulty speaking.

On Dr. Hakala's orders, plaintiff was placed on a liquid diet and remained in the infirmary for 23-hour observation. During that time, he refused to take his medications because

---

[4]Oxygen saturation measurements indicate the level of oxygen in the blood; this helps inform healthcare staff whether respiratory distress is present. Normal oxygen saturation in a healthy individual is 96-100%; the plaintiff's was 96-99%.

he said he could not swallow. However, he drank an orange drink, and the nursing notes state he did so without any apparent difficulty. Then, he requested a snack sack. The infirmary nurse reported this to the on-call physician who then had the plaintiff returned to his cell, but ordered the liquid diet continued until the plaintiff could be evaluated by Dr. Graham or Dr. Hakala.

On August 3, three days after being placed on the liquid diet, the plaintiff returned to the infirmary, complaining that his mouth and throat hurt and he had not eaten in six days. The infirmary nurse contacted Dr. Graham, and he ordered a feeding tube placed. The plaintiff consented to the feeding tube, which was placed and used to give the client Ensure, for nutrition, and water, for hydration. However, the plaintiff found the tube uncomfortable, alleged tube placement accuracy was never checked, and said he could not breathe at all with the tube in place.[5] Plaintiff pulled out the tube that evening against medical advice. Following this, Dr. Graham reassessed the plaintiff and discharged him from the infirmary. The liquid diet order was discontinued on August 10 at the plaintiff's request.

### D. Plaintiff's Abdominal Complaints

During and shortly after his throat complaints, plaintiff complained of abdominal pain, diarrhea, and blood in his stools. Dr. Hakala timely assessed him for these conditions during clinic appointments on August 12 and September 2, 2010. A digital rectal exam was done, the plaintiff's stool was checked for blood, an x-ray of the plaintiff's abdomen was obtained, medications were ordered, and the plaintiff was provided with additional toilet paper upon request. On November 4, 2010, an abdominal CT scan was also ordered to determine if plaintiff had an emergent condition, and his medication regimen for these complaints was changed upon request.

---

[5]His oxygen saturation was still greater than 96% at this time.

### E. Plaintiff's Skin Condition

In his initial complaint, the plaintiff alleged that his chronic skin conditions were exacerbated because he did not receive proper medical treatment. He stated that after he filed a grievance, Dr. Hakala prescribed skin medication, but the medication prescribed made his skin deteriorate more. The plaintiff was examined on multiple occasions for skin complaints throughout his incarceration; a biopsy was taken, and his skin condition was diagnosed as eczema and treated with a topical cream, which was later changed to an ointment at the plaintiff's request because the plaintiff said the ointment "worked better."

### F. Plaintiff's Medication Administration

The plaintiff alleges he received the wrong medication (niacin), in addition to the medications he is prescribed, and that the nurse refused to check the medication prescription book before administering it to him. After receiving the medication, plaintiff claims his skin was itching and burning. Plaintiff was subsequently given aspirin, which relieved the unintended niacin side effects.

## II. Legal Standard

In 2012, plaintiff brought this (now consolidated) lawsuit claiming that his Eighth Amendment right to be free from cruel and unusual punishment was violated by defendants' medical care for the above conditions. Defendants seek summary judgment on all of plaintiff's claims.

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th

7

Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *Mt. Pleasant v. Associated Elec. Coop. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the moving party. *Mt. Pleasant*, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to the discussion.

## III. Discussion

### A. Requirements for Eighth Amendment Claim

To establish a constitutional violation based on inadequate medical care, the plaintiff must show that the defendants were deliberately indifferent to a serious medical need. *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009). "Deliberate indifference has both an objective and a subjective component." *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006). The objective component requires a plaintiff to demonstrate an objectively serious medical need. *Grayson v. Ross*, 454 F.3d 802, 808-09 (8th Cir. 2006). A "serious medical need" is one "that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d. 778, 784 (quoting *Camberos v. Branstad*, 73 F.3d. 174, 176 (8th Cir.1995)); *see also Moore v. Jackson*, 123 F.3d. 1082, 1086 (8th Cir. 1997) ("A medical need is serious if it is obvious to the layperson or supported by medical evidence.").

In order to satisfy the subjective component of his medical claim, the plaintiff must show that the defendants knew of, yet deliberately disregarded, an excessive risk to the inmate's health. *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) (quoting *Logan v. Clarke*, 119 F.3d. 647, 649 (8th Cir. 1997)). A prison official may be liable if he knows that an inmate faces a substantial risk of serious harm and fails "to take reasonable measures to abate it." *Coleman*, 114 F.3d. at 785 (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). The plaintiff must establish a "mental state akin to criminal recklessness." *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009) (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). Moreover, to create an actionable constitutional violation for delay in treatment, "the information available to the prison official must be such that a reasonable person would know that the inmate requires medical attention, or the prison official's actions (or inaction) must be so dangerous to the health or safety of the

9

inmate that the official can be presumed to have knowledge of a risk to the inmate." *Plemmons v. Roberts*, 439 F.3d 818, 823 (8th Cir. 2006). Delay must be prompted by "obduracy and wantonness, not inadvertence or error in good faith," before liability may be imposed. *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### B. Plaintiff's Complaints About His Medical Care

As an initial matter, the Court notes that plaintiff did not respond to the defendant's statement of undisputed facts. Therefore, the Court must deem all of the defendants' facts admitted because plaintiff did not specifically admit or deny defendants' facts, and general denials are not enough to controvert facts allegedly in dispute. Fed. R. Civ. P. 56(e); Local Rule 7-4.01(E); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Hernandez v. Jarman*, 340 F.3d 617, 622 (8th Cir. 2003) (Plaintiff "may not rely on mere denials or allegations"). Plaintiff was required to present material facts supported by citation to the record. *Id*. In the interests of preserving justice and fairness, however, the Court reviewed plaintiff's medical records from his incarceration at SECC. The Court also reviewed all other evidence provided by both parties including affidavits, depositions, and the plaintiff's Exhibit A. Pursuant to Federal Rule of Civil Procedure 56(c)(3), the Court will take all of this information into consideration.

The plaintiff has multiple medical conditions that likely qualify as serious medical needs. However, he fails to satisfy the subjective component of the standard for an Eighth Amendment claim because the information provided shows defendants endeavored to treat all of the patient's illnesses during his incarceration at SECC, and plaintiff provides no evidence suggesting they acted with deliberate indifference towards his serious medical needs. As a general matter, although the plaintiff found the care he received unsatisfactory, *disagreement* with one's

treatment plan does not rise to the level of deliberate indifference to a serious medical need required for a successful Eighth Amendment claim. *Popoalii v. Correctional Medical Services*, 512 F.3d 499, 499 (8th Cir. 2008); *Warren v. Fanning*, 950 F.2d 1370, 1373 (8th Cir. 1991). Even *negligent* treatment does not in itself indicate deliberate indifference. *Id.*

The plaintiff attempts to argue that the defendants refused to send him to a specialist in order to save money. However, he provides no evidence that any of defendants' actions were based on policies or customs or that they were trying to save money in refusing to send him to a specialist. Further, plaintiff relies on an Eleventh Circuit case involving a very distinct and distinguishable set of facts.[6] Defendants maintain that their treatment decisions, including the decision to treat the patient in prison rather than sending him to the hospital or a specialist, were based on the independent medical judgment of their healthcare providers and that they appropriately cared for plaintiff throughout his time at SECC. The following sections address plaintiff's concerns and defendant's responses in more detail.

    *I. Treatment of HIV and Associated Complaints*

Plaintiff insists that the defendants were deliberately indifferent in that they did not refer him to a specialist and denied him his HIV medications for weeks at a time. Defendants' uncontroverted facts, however, demonstrate appropriate care was given. "An inmate cannot create a question of fact by merely stating that he did not feel he received adequate treatment." *Burston v. Missouri Dept. of Corrections, et. al.*, 2012 U.S. Dist. LEXIS 5655 at 11 (E.D. Mo. 2012) (citing *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997)). Here, the plaintiff does

---

[6]The plaintiff in *Fields v. Corizon Health* was a healthy 24 year old man with an infection that resulted in permanent paralysis due to the prison medical staff's failure to get him to the hospital within 24 hours, despite his multiple and insistent pleas for help, nearly all of which were completely ignored. 490 Fed. App'x. 174 (11th Cir. 2012).

not cite to the record in any of his filings with the court, nor does he provide any additional evidence relevant to his claims. It is clear the plaintiff is unhappy with the care he received at SECC, but that alone is not sufficient to maintain his Eighth Amendment claim. Plaintiff alleges he was not given his HIV medications for weeks, but the medical records show his HIV medications --- Lamivudine, zidovudine, darunavir, and ritonavir — were regularly administered to him. Moreover, although the complaint's allegations of denying medications to an HIV-positive prisoner are concerning, plaintiff never again raises the matter, much less does he supply any evidence in support in his opposition to summary judgment.

Plaintiff also makes a more general accusation that defendants failed to treat his HIV adequately, causing a worsening of his illness. It is somewhat difficult to decipher plaintiff's filings, but it seems he attributes this to a plethora of complaints, which are detailed in the case summary above, ranging from limb pain to skin rashes. However, according to Dr. Hakala's affidavit, which he states is based upon his medical knowledge and training, "symptoms of HIV infection include, but are not limited to, weight loss, oral thrush, recurring yeast infections, bruising easily, recurrent oral ulcerations, recurrent or unusual skin rashes, experiencing extreme numbness in hands and feet, and mental deterioration." The Court also notes that plaintiff, in addition to having HIV, was also enrolled in chronic care clinics for individuals with respiratory problems and diabetes. This suggests multiple other disease processes that could have led to the plaintiff's deterioration despite his receiving appropriate medical treatment. Therefore, even if all of plaintiff's complaints are considered serious medical needs, plaintiff has not provided any evidence that his illnesses --- throat swelling, difficulty breathing, limb pain and numbness, skin conditions, abdominal complaints --- arose from any treatment or lack of treatment for which the

defendants are responsible. Moreover, the undisputed medical records and other evidence show that plaintiff's complaints were treated, and that the complaints were frequently treated according to plaintiff's wishes. For example, plaintiff's rashes were treated with topical ointments, and plaintiff's ingrown toenail was removed.

Further, the medical record reveals multiple instances of plaintiff's noncompliance with treatment protocols, including failure to take his HIV medications, refusing to allow healthcare staff to complete physical assessments or take his vital signs, pulling out his feeding tube, and missing appointments at chronic care and infectious disease management clinics. However, despite plaintiff's occasional refusal to take his medications, the medication administration record ("MAR") shows plaintiff complied with his medication regimen more than 80% of the time while at SECC. This was substantiated in that his CD4 levels and viral load (which were checked every two to six months from March 2010 to February 2012) indicated his HIV was being effectively controlled.

The plaintiff's medical history further shows an extensive treatment plan for the plaintiff as well as counseling regarding the importance of smoking cessation and exercise. It reflects that defendants regularly responded to plaintiff's requests for assessments and reassessments, changes in treatment, and additional medications. This demonstrates the defendants were not deliberately indifferent to plaintiff's other medical needs, including but not limited to his lower limb pain, throat swelling, skin condition, and abdominal complaints. Therefore, as to his HIV diagnosis and other, potentially-related ailments, plaintiff failed to show defendants were deliberately indifferent to a serious medical need.

    *ii. Liquid Diet*

Plaintiff is critical of defendants' treatment of his oral complaints, which included tongue swelling and a sore throat, alleging that the defendants caused him to go without food for either nine days, as alleged in plaintiff's declaration in opposition, or three weeks, as alleged in plaintiff's initial complaint. However, the defendant was placed on a liquid diet by SECC physicians because of his symptoms of throat and tongue swelling and complaints of pain and irritation. Although he wanted to go to the hospital and be seen by a specialist, the SECC physicians exercised their medical judgment and chose to treat him at the prison as his vital signs were stable, he was awake, alert, and speaking without difficulty, and none of the healthcare staff actually observed him having any difficulty swallowing, the only indication was his own subjective complaints. However, the Court is not required to analyze whether the physicians acted correctly in ordering a liquid diet, and later a feeding tube, to treat the plaintiff's sore throat because "nothing in the Eighth Amendment prevents prison doctors from exercising their independent professional judgment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).

Here, the medical records show the defendants assessed and treated the plaintiff's sore throat and tongue swelling by ordering a liquid diet and prescribing medication. Observable tongue swelling and throat redness was documented. The liquid diet was ordered despite the fact that plaintiff alleged he could not swallow liquids based on the physician's judgment after physically examining the plaintiff. This judgment proved correct when the plaintiff was observed drinking an orange drink without any difficulty. However, because the plaintiff continued to complain that he could not swallow liquids, a feeding tube was ordered so he could be given his medications and adequate nutrition. Plaintiff pulled out the feeding tube, after

consenting to its placement, because he alleged he could not breathe with it in place.[7] Because his symptoms had not abated, the liquid diet was continued. Approximately a week later, a regular diet was ordered for him at his request. He was assessed frequently and his vital signs remained stable throughout this incident. The record shows that the defendants provided appropriate treatment and that they were not deliberately indifferent to the plaintiff's sore throat and associated complaints of tongue swelling, denial of nutrition, and difficulty breathing.

    *iii. Niacin Administration*

The allegations that nurse Lacy gave the plaintiff the wrong medication (Niacin) do not rise to the level of deliberate indifference to a serious medical need because it was a one time occurrence, unintentional, and he was almost immediately given aspirin to counter the negative effects of the niacin. That medication successfully relieved all of the adverse symptoms he experienced. Plaintiff complains that nurse Lacy did not check the prescription book as he requested before administering the Niacin. However, medical malpractice, including negligent drug administration, does not meet the high standard necessary for a successful Eighth Amendment claim. *Popoalii*, 512 F.3d at 499 (citing *Smith v. Clarke*, 458 F.3d 720, 724 (8th Cir. 2006)). Plaintiff cannot support a deliberate indifference claim against defendant Lacy.

**IV. Plaintiff's Motion for the Introduction of New Evidence and Witness Testimony (#74)**

After plaintiff submitted his memorandum in opposition to defendants' motion, he moved to add a witness and inform the Court of new evidence (#74). Plaintiff says that a doctor

---

[7]His oxygen saturation was over 96% at this time and he was awake and talking per the medical records.

employed by the prison's contracted healthcare provider was willing to be a witness on his behalf, but he provides no other information about what the doctor would testify to or how it would advance his case. Further, plaintiff submits (#75) a copy of a neurologist's report dated September 2013. The Court has reviewed the report and, setting aside the admissibility of the report generally, finds that this report does not affect the Court's decision. It contains test results taken a year past the time period at issue, and, even if the report were within the relevant window of time, it fails to connect the actions of any of the defendants to the plaintiff's complaints. Plaintiff's motion will be denied.

V. **Conclusion**

The plaintiff failed to present any material issues of disputed fact so as to demonstrate that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Therefore, summary judgment will be granted to the defendants by separate order, and plaintiff's motion to introduce new evidence will be denied.

Accordingly,
**IT IS HEREBY ORDERED** that the defendants motion for summary judgment (#64) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to "Add Witness and to Inform of New Evidence" (#74) is **DENIED as moot.**

Dated this 27th day of December, 2013

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE